UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| MARK E. WARPENBURG, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:06-cv-00829-RLY-TAB |
| | ) | |
| TARGET CORPORATION, | ) | |
| Defendant. | ) | |

**ENTRY ON TARGET CORPORATION'S MOTION FOR SUMMARY
JUDGMENT**

Plaintiff,  Mark E. Warpenburg ("Plaintiff"), is a former employee of defendant,

Target Corporation ("Target").  Following his termination in April 2006, Plaintiff filed

the instant employment discrimination suit against Target, alleging that Target violated

the Age Discrimination in Employment Act ("ADEA") (Count I), 29 U.S.C. § 621 *et seq*.;

the Americans With Disabilities Act ("ADA") (Count II), 42 U.S.C. § 12102 *et seq*.; and

the Employee Retirement Income Security Act ("ERISA") (Count III), 29 U.S.C. § 1132

*et seq*.  Plaintiff also claims that Target retaliated against him in violation of the ADEA

and ADA, that Target failed to accommodate his alleged disability under the ADA, and

that Target disclosed his confidential medical information.

Target now moves for summary judgment on all claims alleged in Plaintiff's

Complaint.  For the reasons explained below, the court **GRANTS** in part, and **DENIES**

in part, Target's motion.

1

## I.      Summary Judgment Standard

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In considering a motion for summary judgment, a court must draw all reasonable inferences in the light most favorable to the non-movant.  *See Spraying Sys. Co. v. Delavan, Inc*., 975 F.2d 387, 392 (7th Cir. 1992).  The court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.

In determining whether a genuine issue of material fact exists, the court must view the record and all reasonable inferences in the light most favorable to the non-moving party.  *Heft v. Moore*, 351 F.3d 278, 283 (7th Cir. 2003).  The moving party bears the burden of demonstrating the "absence of evidence on an essential element of the non-moving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The non-moving party may not, however, simply rest on the pleadings, but must demonstrate by specific factual allegations that a genuine issue of material fact exists for trial.  *Green v. Whiteco Industries, Inc.*,  17 F.3d 199, 201 (7th Cir. 1994) (citing *Celotex*, 477 U.S. at 322)).

## II.     Facts

### A.      Background

1.      Target's stores are organized into districts, and the districts are organized into

groups.  Plaintiff worked at store T0103 in Indianapolis, Indiana.  T0103 is part of district 140 ("D140") and group 194 ("G194").  (Affidavit of Alicia Petross ("Petross Aff.") ¶¶ 8, 9).  Laureen Budd ("Budd") was the District Team Leader, and Gabrielle Edwards ("Edwards") was the Human Resources Representative ("HRR") for D140.  (Deposition of Laureen Budd ("Budd Dep.") at 12; Deposition of Gabrielle Edwards ("Edwards Dep.") at 11, 17).

2.   Plaintiff worked for Target from November 5, 1979, through April 14, 2006. Plaintiff was 51 years old at the time of his termination.  (Amended Complaint ¶¶ 1, 2, 10).

3.   In May 2004, Target transferred Plaintiff to the position of Executive Team Leader ("ETL")-Merchandising at T0103.  (Affidavit of Laureen Budd ("Budd Aff.") ¶ 5).

4.   Plaintiff reported to acting Store Team Leader ("STL") Alan Kulke ("Kulke"). (Deposition of Mark E. Warpenburg ("Plaintiff Dep.") at 124).

5.   The record indicates that as of March 2005, Plaintiff received satisfactory performance reviews.   (Plaintiff's Exs. 43-45).

6.   In June 2005, Plaintiff began reporting STL Jeff Singleton ("Singleton"). (Amended Complaint ¶ 30; Answer ¶ 30).

7.   The ETL-Merchandising position was a management level position over the entire sales floor, which consists of "Softlines" (i.e., clothes and hanging goods) and "Hardlines" (generally, all other merchandise).  Plaintiff's position at T0103 changed to that of ETL-Hardlines when Phil Bradshaw ("Bradshaw") reported to

T0103 in July 2005 and assumed the position of ETL-Softlines.  (Budd Aff. ¶ 7).

8.   There is no difference between the job duties ("core roles") of ETL-Hardlines, other than the type of merchandise handled.  (Plaintiff Dep. at 45-46, 119-20; Budd Aff. ¶¶ 6-8).

9.   Since approximately the year 2000, Plaintiff has suffered from multiple physical impairments of the back and spine.  (Plaintiff Dep. at 293; Amended Complaint ¶ 27).  His back impairment has required several work restrictions, including not lifting more than 20 pounds, refraining from repetitive lifting, and wearing high quality boots to support his back.  (Plaintiff Dep. at 18-19).

10.  Plaintiff also suffers from anxiety and depression.  (Plaintiff's Ex. 21).  In 2001, he took a two-month medical leave of absence for the same.  (Plaintiff's Ex. 93).

11.  Plaintiff was able to perform all of the core roles for the position of ETL-Hardlines – driving profitable sales, maintaining merchandising guidelines, maximizing the guest's experience and management of team leaders ("TLs"), members and specialists – the entire time that he worked at T0103 regardless of any restrictions.  (Plaintiff Dep. at 47-48, 120; Plaintiff Dep. Ex. 10).

**B.   Plaintiff's Final Written Warning for Unacceptable Conduct**

12.  On June 28, 2005, Plaintiff and several TLs, including Christina Crowe ("Crowe"), were discussing "fixing" the fitting room schedule.  Immediately after Elaine Fox ("Fox") – ETL-Human Resources at T0103 – left the area, Crowe said, "I hate that woman [referring to Fox] with all of my being.  I wish she were dead!  I wish

4

someone would just kill her and put her out of her misery."  TL Brian Slusser replied, "You don't really mean that," to which Crowe replied, "I really do." (Plaintiff Dep. at 143-46 and Plaintiff Dep. Exs. 12 and 13).

13.     Neither Plaintiff nor Slusser immediately reported the threat.  (Plaintiff's Ex. 133 at 1).

14.     Plaintiff's next scheduled day of work was July 1, 2005, at which point he reported the threat to Singleton.  (Defendant's Ex. 12; Deposition of Elaine Fox ("Fox Dep.") at 28).  Singleton immediately requested that the incident be reported to Edwards.  Pursuant to Singleton's request, Plaintiff reported the incident to Edwards via telephone and followed up with an e-mail.  (Plaintiff's Ex. 13; Fox Dep. at 29).

15.     Edwards went to T0103 and interviewed all of the witnesses to the Crowe threat against Fox.  (Affidavit of Gabrielle Edwards ("Edwards Aff." ¶ 11; Fox Dep. at 31-33).

16.     Target considered Plaintiff's delay in reporting the incident to be unacceptable "Negligent Conduct," which is a "Serious Offense" under Target's Coaching and Corrective Action Policy, calling for a Final Warning for the first offense. (Edwards Aff. ¶ 14).  Accordingly, Singleton and Edwards issued a Final Warning to Plaintiff on July 15, 2005.  (Plaintiff Dep. at 145-46 and Plaintiff Dep. Ex. 12; Deposition of Jeff Singleton ("Singleton Dep.") at 51-56 and Singleton Dep. Ex. 14).

17.   On July 19, 2005, Plaintiff faxed a written complaint to Kelli Cavasin ("Cavasin"), Target's Regional Human Resources Manager, claiming that these actions were being taken against him because of his age and complaining of Edwards' calling him "paranoid."  (Plaintiff's Ex. 15 at 4-5).

### C.   Plaintiff's Leave of Absence and Return

18.   Plaintiff's work situation exacerbated his anxiety and depression.  Plaintiff therefore took a medical leave of absence from July 21, 2005, until November 16, 2005.  (Plaintiff's Ex. 21 at 2).

19.   When Plaintiff returned from his leave of absence, Plaintiff was placed under new restrictions by his treating physician, which required an accommodation to Plaintiff's work schedule in order to ensure the effectiveness of the prescription medications he was taking.  (Plaintiff's Ex. 25).

20.   Plaintiff informed Budd of his restrictions and requested a transfer to a different store so that he would no longer report to Singleton.  (Plaintiff's Ex. 33).

21.   That day, Budd denied Plaintiff's request and informed him that he needed to improve his relationship with the team leaders and resolve those concerns before she would consider relocating him to a different store.  (Budd Aff. ¶ 19).

### D.   Bottom 10%

22.   During Plaintiff's leave of absence, September 7, 2005, Plaintiff was placed in the "Bottom 10%" category of the Target Performance Grid.  (Plaintiff's Ex. 99 at 304).

### E.      Charge of Discrimination

23.   On November 16, 2005, the day Plaintiff returned to work from his medical leave,

Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity

Commission, alleging age and disability discrimination arising from the July 15

incident with Crowe.  (Plaintiff's Ex. 33; Plaintiff Dep. at 204).

24.   Also on November 16, 2005, Plaintiff informed Budd that he filed a charge of

discrimination, but did not inform her of the content of the charge.  (Budd Aff. ¶

15).

25.   Edwards testified that she did not receive the charge until on or after November

25, 2006.  (Edwards Aff. ¶ 16).

### F.      Plaintiff's Mid-Year Performance Review

26.   On November 23, 2005, Plaintiff received his mid-year performance review from

Singleton and Budd and was placed under a work performance plan.  The mid-year

performance review covered the period February through July 2005.  (Singleton

Dep. at 80).

27.   The mid-year performance review reflected that Plaintiff was deficient in that he

did not honestly assess himself, did not solicit feedback, was not open to and did

not use performance feedback, did not accept personal responsibility, did not

approach conflict proactively, and did not take quick action when faced with

problems.  (Singleton Dep. at 81-83; Singleton Dep. Ex. 102; Affidavit of Jeffrey

Singleton ("Singleton Aff.") ¶ 15).  Thus, he received an unsatisfactory mid-year

review and was placed on a work performance plan. (Budd Dep. at 43-51; Singleton Dep. at 77-87; Singleton Dep. Exs. 36, 37, 102, 104).

28. At the time Singleton issued the performance review, Singleton and Plaintiff had only worked together for two or three weeks. (Budd Dep. at 18, 25; Singleton Dep. at 40-41, 79).

29. Singleton and Budd had been working on Plaintiff's mid-year review and work performance plan before Plaintiff went on his leave of absence on July 20, 2005. (Budd Dep. at 64-66; Singleton Dep. at 78-87; Singleton Dep. Exs. 36, 37, 102, 103).

30. Singleton testified that he spoke to Kulke on the telephone before he submitted the review to Plaintiff. (Singleton Dep. at 81).

31. In an e-mail from Kulke to Singleton dated November 29, 2006, Kulke stated that he "read over the review" and that he "agree[d] with all but one part – the 'does what it takes to get the job done.' [Plaintiff] had no problem putting in the long hours or whatever it took to get things done." (Singleton Dep. Ex. 38).

**G.      Singleton Begins to Document his Dealings with Plaintiff**

32. In November or December 2005, Singleton began to monitor his conversations with Plaintiff, and kept documents relating to Plaintiff in his locked briefcase, which he took home with him every night. Singleton cannot remember doing this for any other employee. (Singleton Dep. at 97-99).

33. Moreover, Singleton began preparing a written warning on Plaintiff, and

8

continually updated it with feedback from Edwards and Budd, until Plaintiff was terminated.  (Singleton Dep. at 107-09).

**H.    Plaintiff Sends a Written Complaint to Cavasin**

34.    On December 16, 2005, Plaintiff sent a written complaint to Cavasin stating that he felt he had been harassed and retaliated against since returning to work from medical leave and that these actions had been taken against him because of the charge of discrimination he filed with the EEOC.  (Plaintiff's Ex. 54).

**I.    Plaintiffs' Request to be Assigned to Softlines**

35.    On February 13, 2006, Plaintiff requested that he be assigned to the Softlines side of the store, claiming that the change would better accommodate his medical restrictions.  This request was denied.  (Amended Complaint ¶ 55; Amended Answer ¶ 55).

36.    Plaintiff admits that he could perform all aspects of his job as ETL-Hardlines within his restrictions.  (Plaintiff Dep. at 120).

**J.    Plaintiff Files a Second Charge of Discrimination**

37.    Plaintiff filed his second charge of discrimination on March 15, 2006, alleging that Target evaluated him poorly and disciplined him unfairly due to his age and disability and in retaliation for filing previous charges of discrimination. (Plaintiff's Ex. 88).

**K.    The Employee Purchase Policy**

38.    Target's employee purchase policy requires, in part, that merchandise be stocked

on the sales floor before a team member may purchase it.  The purpose of the policy is to provide guests an opportunity to purchase the item.  (Deposition of Jeanne Bottom ("Bottom Dep.") at 81-85; Edwards Aff. ¶ 8).

39.  There is no stated time period that the merchandise must be placed on the floor before the team member can purchase an item.  The item must simply be placed on a shelf or a rack on the sales floor before the team member's purchase.  (Budd Dep. at 82, 85; Fox Dep. 19-22).

40.  Violations of the employee purchase policy were rampant in 2005; thus, the subject came up during several meetings with team members during executive meetings in late 2005.  (Bottom Dep. at 123-26).

**L.    Plaintiff's TV Purchase**

41.  On Wednesday, March 22, 2006, Jeanne Bottom ("Bottom"), ETL-Asset Protection, was doing inventory prep in the electronics stockroom.  She observed a flat screen LCD TV on the top shelf that had been discontinued and was not showing up with the aid of the UPC scanner.  Bottom could not price the item because a price-change team member needed to determine the price of the TV. Bottom told Singleton about the TV and advised him that she would follow-up with a price-change team member.  (Bottom Dep. at 127-37; Bottom Aff. ¶ 4).

42.  On Friday, March 24, 2006, Bottom approached price-change TL Erin Fuentes ("Fuentes") in order to further investigate the TV.  Fuentes scanned the TV and, although it still scanned "Not on File," was able to give Bottom a price.  Bottom

10

then called Plaintiff, as the manager on duty, to the stockroom.  (Bottom Dep. at
127-37; Plaintiff Dep. at 247-48, 251).

43.    When Plaintiff arrived in the stockroom, Bottom asked him what they should do
with the TV as it would sit in the stockroom and be salvaged if nobody would buy
it.  (Plaintiff Dep. at 249; Bottom Dep. at 137).

44.    Bottom asked Plaintiff if he would like to purchase the TV for $1,049.96.  Plaintiff
initially said no, but then reconsidered and decided to buy it for his wife's
business.  (Plaintiff Dep. at 250-51).

45.    A team member in the stock room took the TV off the top shelf, handed it to
Bottom who then placed it in a shopping cart.  (Bottom Dep. at 139-40).

46.    Plaintiff pushed the shopping cart to the front of the store and purchased the TV
with his wife's credit card and without using his employee discount.  (Plaintiff
Dep. at 255).

**L.    Plaintiff's Notification of Surgery, Suspension and Termination**

47.    Four days after Plaintiff purchased the TV, on March 28, 2006, Plaintiff notified
Singleton by e-mail that his physician would be scheduling him for back surgery in
April or May 2006 and that he anticipated needing time off work for surgery and
recovery.  (Plaintiff's Ex. 69).

48.    Around this time frame, Singleton asked Bottom what happened to the TV that
was found in the electronics stockroom.  Bottom told Singleton that Plaintiff
bought the TV, but that she did not believe he put it on the sales floor.  (Bottom

Dep. at 148).

49.     At Singleton's request, Bottom conducted an investigation into the TV purchase and submitted her report to Singleton on March 30, 2006. Target concluded that Plaintiff had not made the TV available for sale prior to purchasing it, thus violating Target policy. (Bottom Dep. at 161-64; Bottom Dep. Exs. 64, 96, 97; Singleton Dep. at 129-34).

50.     Bottom testified that in order to make the TV "available for sale," Plaintiff would have had to take the TV box out of the cart and place it, unlocked, on a shelf for an unspecified period of time, in violation of Target's lockdown policy, or would have had to take the TV out of the box, empty a display case, place it in the display case, and leave it there for an unspecified period of time. (Bottom Dep. at 145).

51.     Taking the TV out of the box and placing it on a locked display shelf would have resulted in an additional 30% "display model" discount for Plaintiff. (Bottom Dep. at 145).

52.     On April 7, 2006, after Plaintiff returned from a week-long vacation, Singleton placed Plaintiff on suspension pending further investigation of his TV purchase and possible violation of Target's employee purchase policy. (Plaintiff Dep. at 270-74; Plaintiff Dep. Ex. 70).

53.     Plaintiff returned to the store on April 14, 2006, for a follow-up meeting concerning his suspension, and his employment was terminated. The termination notification was signed by Singleton and Alicia Petross ("Petross"), the Human

12

Resources Manager for G194.  (Plaintiff's Ex. 77).  Budd testified that she

"participated" in the decision to terminate Plaintiff.  (Budd Dep. at 129).

**M.    Other Alleged Violations of the Employee Purchase Policy**

54.   Plaintiff testified that prior to the time he was assigned to Store T0103, Bradshaw

(age 54)[1] violated Target's employee purchase policy by hiding overstocked items

in the stockroom waiting for those items to go on clearance, and purchasing them

at the clearance price.  (Plaintiff Dep. at 97-101).  Plaintiff further testified that

while they were both at T0103 in December 2005, he observed Bradshaw take

overstocked Christmas items from the stockroom and place them on an individual

flat "of [Bradshaw's] own merchandise that [Bradshaw] was going to buy."

(Plaintiff Dep. at 94).  Plaintiff did not observe him do anything else with the

merchandise, but testified that Target employee Star Santellana ("Santellana") had

seen him purchase like items.  (Plaintiff Dep. at 94).  Santellana testified, however,

that she never saw Bradshaw make specific purchases of such merchandise.

(Deposition of Star Santellana ("Santellana Dep.") at 35-36).

55.   Santellana testified that prior to Plaintiff's termination (2005 or early 2006),

Singleton instructed her to mark down a basketball goal that was in the stockroom

and that he would purchase it when his shift ended.  Although Santellana did not

see Singleton purchase the basketball goal, she testified that the basketball goal

---

[1] The ages of the Target employees cited are found in Defendant's Ex. 63, a sealed
document.  The ages are as of Plaintiff's termination date, April 14, 2006.

was gone after his shift ended.  (Santellana Dep. at 13-14, 19-20; Plaintiff Dep. at 85-87).  Singleton disputes Santellana's testimony, stating that he offered the basketball goal for sale prior to purchasing it, and that Bottom witnessed him purchase the item from the sales floor.  (Singleton Dep. at 124-25).

56.   Plaintiff alleges that Brad Jones ("Jones") (age 44), another Target management employee, purchased a Dyson vacuum display model with his employee discount.  Plaintiff did not see Jones violate the policy.  (Plaintiff Dep. at 285-87).  Target acknowledges that Jones purchased a TV in October 2005 in violation of that policy.  (Bottom Dep. at 91-92).

57.   Budd (age 42) testified that she asked an employee at T0103 to hold a patio set in her name that was on clearance.  Upon further examination, she testified that she purchased the patio set on clearance at another Target store.  (Budd Dep. at 110-11).

58.   Santellana testified that she believed Slusser (age 23) and Bottom (age 27) violated the employee purchase policy by purchasing old display furniture.  Her testimony, however, is based solely upon the statements of a friend, Jamie Robinson ("Robinson").  (Santellana Dep. at 73-75).

59.   Santellana also testified that Bottom purchased Target toys and other items, including a television set, without making them sellable.  Again, Santellana's testimony is based on the statements of Robinson.  (Santellana Dep. at 35-37, 58-61, 73-75).

14

60.   Robert Cox ("Cox") (37), management-level Target employee, purchased Global
      Bazaar items that were on sale without making them available to customers on
      February 23, 2006.  After an investigation, Cox was terminated on March 22,
      2006.  (Petross Aff. ¶¶ 20-21).

61.   On November 8, 2005, Target ETL Ray Baker ("Baker") discovered, after an
      investigation, that Brian Clesi ("Clesi") had stolen at least $300 worth of Target
      merchandise.  Clesi also purchased two X-box 360s off the delivery truck without
      first making them available for sale.  Baker's investigation also revealed that Clesi
      had been stealing items from Target and then returning them for the refund.
      (Defendant's Ex. 19).

### N.   Plaintiff Files a Third Charge of Discrimination

62.   Plaintiff filed a charge of discrimination on May 3, 2006, again alleging age and
      disability discrimination and retaliation with respect to the circumstances
      surrounding his termination.  (Defendant's Ex. 22).

### O.   Target's Pension Plan

63.   Target offers a pension plan for its employees.  (Deposition of Janet Spielman
      ("Spielman Dep.") at 7-8).

64.   Prior to January 1, 2003, Target offered one option for the pension plan ("the
      Traditional Plan").  (Spielman Dep. at 21-26; Spielman Dep. Ex. 165 at TC 7540).
      During 2002, Target decided to add another option to its pension plan ("the
      Personal Pension Account") to make the plan a better tool for recruitment and

15

retention.  (Spielman Dep. at 10-11; Spielman Dep. Ex. 165 at TC 7540);

Deposition of Jeff Bailey ("Bailey Dep.") at 17-18, 40-42).

65.     After Target added this option, employees who became pension plan eligible after

January 1, 2003, were required to participate in the Personal Pension Account and

could not choose the Traditional Plan.  (Spielman Dep. Ex. 165 at TC 7540).

66.     Employees who were eligible before January 1, 2003, however, could choose

whether to remain in the Traditional Plan or participate in the Personal Pension

Account.  (Spielman Dep. at 42-45; Spielman Dep. Ex. 165 at TC 7549).  Target

allowed such employees to make their choice during several "windows."

Employees who did not affirmatively make an election were defaulted into the

Personal Pension Account.  (Spielman Dep. at 43, 65, 81-84, 121; Spielman Dep.

Ex. 165 at TC 7540; Spielman Dep. Ex. 164 at 7587A).

67.     Plaintiff employed Dr. Harnett to conduct an independent statistical analysis of

data on 5,643 Target employees.  (Plaintiff's Ex. 5).

68.     Dr. Harnett concluded "that employees 40 and over who selected the Prior Plan are

significantly more likely to be Involuntarily Terminated than those who selected

the New Plan.  The statistical conclusion from this analysis is one of

discrimination."  (Plaintiff's Ex. 5).

69.     Defendant does not raise a *Daubert* challenge to the admissibility of Dr. Harnett's

expert report.

16

### III.      Discussion

### A.      Age Discrimination

Plaintiff alleges he was terminated in violation of the ADEA.  A plaintiff may prevail on an ADEA claim if he shows that his termination would not have occurred "but for" his employer's age-based discriminatory motive.  *DeWeese v. DaimlerChrysler Corp.*, 120 F.Supp.2d 735, 745 (S.D. Ind. 2000) (citing *Fuka v. Thomson Consumer Elecs.*, 82 F.3d 1397, 1403 (7th Cir. 1996)).  An ADEA plaintiff may establish his claim through direct evidence or through the indirect, burden-shifting approach first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Rummery v. Illinois Bell Tel. Co.*, 250 F.3d 553, 556 (7th Cir. 2001).

Here, Plaintiff has no direct evidence of age discrimination.  Thus, in order to prevail, Plaintiff must first show a prima facie case of age discrimination.  This requires him to show that: (1) he was 40 years of age or older, (2) he was performing his job to his employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) similarly situated substantially younger employees were treated more favorably.  *Id.*  "Substantially younger" is generally defined as a ten-year difference in age.  *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 322 (7th Cir. 2003) (citing *Hartley v. Wisc. Bell, Inc.*, 124 F.3d 887, 893 (7th Cir. 1997)).  The parties dispute the third and fourth elements.

### 1.      Adverse Employment Action

Plaintiff advances the following as adverse employment actions: (1) the July 15,

2005, Final Written Warning; (2) the November 22, 2005, Mid-Year Review and Work

Performance Plan; (3) his placement in the "Bottom 10%" of managers on Target's

Performance Grid on September 7, 2005; (4) Budd's denial of Plaintiff's request to

transfer him on November 16, 2005; and (5) Plaintiff's suspension on April 7, 2007, and

termination on April 14, 2006, for violating the employee purchase policy. Target

challenges the adverse employment actions relied upon by Plaintiff.

 Adverse employment actions affect the terms and conditions of one's employment,

typically resulting in economic injury. *Whittaker v. Northern Ill. Univ.*, 424 F.3d 640,

648 (7th Cir. 2005). While adverse employment actions "'can encompass other forms of

adversity,'" the actions complained of must result in some form of tangible job

consequence. *Id*. at 648-49 (quoting *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir.

1996)). Thus, negative performance evaluations, unfair reprimands, and written

warnings, while "putatively disciplinary measures," without more, do not constitute

adverse employment actions. *Whittaker*, 424 F.3d at 648; *Grube v. Lau Indus., Inc.*, 257

F.3d 723 (7th Cir. 2001) ("[U]nfair reprimands or negative performance evaluations,

unaccompanied by some tangible job consequence, do not constitute adverse employment

actions."). This analysis also applies to requests to transfer. *See Tyler v. Ispat Inland Inc.*,

245 F.3d 969, 972 (7th Cir. 2001) (finding that a purely lateral transfer that does not

change terms and conditions of employment is not an adverse employment action). Thus,

Plaintiff's Final Written Warning, his Mid-Year Review and Work Performance Plan, and

his request to transfer to another Target store, do not constitute adverse employment

actions.

In addition, there is no evidence that Plaintiff's placement in the "Bottom 10%" category of Target management constituted an adverse employment action.  Plaintiff argues that the designation did affect the terms and conditions of his employment because "Target was obligated to 'take action' and either move those employees out of the bottom 10% or terminate them within a specified period of time."  (Plaintiff's Response at 14). In support of this proposition, Plaintiff testified that Budd "instructed" him "to get rid of those people (in the bottom 10%) as soon as possible, whatever it took, to make note after note, list after list, document everything that they did, and try to find something, some reason why they should be terminated."  (Plaintiff Dep. at 131).  There is no evidence, however, that anyone on the list was actually terminated due to his or her status of being in the bottom 10%.  Thus, whether being placed in the bottom 10% would result in an adverse employment action was speculative at best.  The court therefore finds that Plaintiff's placement in the bottom 10% did not constitute an adverse employment action. Accordingly, the only adverse employment action relevant to Plaintiff's age claim are Plaintiff's suspension and termination.

### 2.    Similarly Situated Substantially Younger Employees

#### a.    Target Employees

Plaintiff argues that Bottom and Slusser, who at the time of Plaintiff's termination were 27 and 23 years of age respectively, violated the employee purchase policy, yet were not terminated for that violation.  In support of this argument, Plaintiff relies on the

testimony of Target employee Santellana.  Santellana testified that although she believes

Slusser and Bottom violated the employee purchase policy, her accusations against them

are based solely on the statements of a friend, Jamie Robinson.  (Santellana Dep. at 73-

75).  Thus, her testimony is based upon inadmissible hearsay.  Similarly, Santellana's

testimony against Bottom relating to her buying toys and other items, including a

television set, without making them sellable, are also based on the statements of

Robinson, and are equally inadmissible.  (Santellana Dep. at 35-37, 58-61, 73-75).

Plaintiff also argues that Singleton (41) and Budd (42) violated Target's employee

purchase policy and were not terminated.  Target responds that Singleton and Budd were

less than 10 years younger than Plaintiff; thus, they were not "substantially younger" than

Plaintiff.  Defendant's Ex. 63 reflects that Singleton was 9 years and 11 months younger

than Plaintiff, and Budd was 9 years and 3 months younger than Plaintiff.  For purposes

of this motion, the court finds that they are sufficiently younger than Plaintiff to be

considered in his prima facie case.

With respect to Singleton, Plaintiff offers evidence through the testimony of

Santellana that Singleton purchased a basketball goal in violation of employee policy.

Santellana testified that Singleton instructed her to mark down the item that was located

in the stockroom for him to purchase after he finished his shift.  Santellana also testified

that the basketball goal was gone after Singleton's shift ended.  (Santellana Dep. at 13-14,

19-20; Plaintiff Dep. at 85-87).  Although Singleton disputes that he purchased the

basketball goal in violation of Target policy, (Singleton Dep. at 124-25), the court finds

Santellana's testimony could lead a reasonable juror to infer that Singleton did in fact violate Target's employee purchase policy.

Budd testified that she asked a Target employee to hold a patio set for her that was on clearance. However, the evidence is undisputed that Budd did not purchase the patio set at T0103; rather, she made a call to another Target store and purchased it there. (Budd Dep. at 110-11). This evidence, without more, is insufficient for the court to find that Budd's purchase of a patio set that was on clearance at another Target store violated Target's employee purchase policy.

### b. Employee Purchase Records

Plaintiff also relies upon employee purchase records produced by Target for T0103 to support his proposition that 151 purchases were made by employees either before the store opened at 8:00 AM or between 8:00 AM and 8:10 AM, during 2005 and 2006. (*See* Plaintiff's Ex. 34). These purchases, he contends, confirm that Target employees frequently violated the employee purchase policy, yet suffered no adverse consequences for the same. An examination of the document reveals several important flaws. As an initial matter, the document does not identify the ages of any of the employees on the list. Thus, it is impossible to determine whether any of the employees on the list were substantially younger than Plaintiff. In addition, an employee purchase made at or around 8:00 AM does not necessarily mean that the purchase violated Target's employee purchase policy. Bottom testified that so long as the clearance merchandise was offered for sale the day before at the clearance price, the employee purchase was in compliance

21

with policy.  (Bottom Dep. at 127).

### c.      Other Evidence

#### 1.      Cherry-Picking

Target contends that in the event the court finds evidence of similarly-situated substantially younger employees, it should still find for Target because Plaintiff is merely "cherry-picking" his comparators.  According to Target, Plaintiff only points to two significantly younger employees – Slusser and Bottom – who were not terminated for alleged violations of the employee purchase policy, but he ignores other employees "who are *not* significantly younger than Plaintiff and who were *not* terminated for alleged violations of the employee purchase policy.  [Plaintiff] also ignores some significantly-younger employees who *were* terminated for such violations."  (Defendant's Moving Brief at 24) (emphasis in original).  Target then concludes, based upon Defendant's sealed Exhibit 63, that Target terminated 20% of the management-level employees who were not significantly younger than Plaintiff and allegedly violated the employee purchase policy, but terminated 50% of the management-level employees who were significantly younger than Plaintiff.  Target thus concludes that it was more likely to terminate the significantly younger employees than those within Plaintiff's age range.  Thus, age was not a motivating factor in his termination.

Target's analysis is taken from the Seventh Circuit's opinion in *Crawford v. Indiana Harbor Belt R.R. Co.*, 461 F.3d 844 (7th Cir. 2006).  In that case, an African-American female conductor was terminated for receiving eight reprimands during her

first year of employment. The plaintiff was the only African-American female conductor

employed by the defendant at that time.  Following her termination, the plaintiff brought a

race and gender discrimination case against her employer, alleging in part that two

similarly-situated white male employees who committed equally serious infractions were

not terminated.  *Id*. at 845.  The defendant countered that it fired 10 similarly-situated

white male conductors for similar infractions within the two-year period surrounding the

plaintiff's termination.  *Id*.  Based upon this evidence, the Court stated:

> Suppose then that 12 male employees – the 10 that were fired and the 2 who
> were not – were comparable to the plaintiff; then 5/6 of the comparable
> males were treated as badly as she was.  This means that 100 percent of the
> "bad" black female workers were fired and 83 percent of the "bad" white
> males, but since there was only one worker in the first class, namely the
> plaintiff, the percentage could not be less than 100 percent.  Since perfect
> enforcement of company rules is hardly to be expected, the fact that "only"
> 83 percent of the "bad" white men were fired does not support an inference
> that the defendant treats white men better than black women.
>
> The plaintiff says that the number of comparable white men who were
> treated better than she was 10 rather than 2 – the 2 were just the most
> egregiously bad of the bad male workers, and if that is right then the
> percentage of bad men who were fired was only 50 percent, and this begins
> to suggest that men were treated more leniently than the plaintiff was.  But
> only if the men who were retained really were no better than she, a
> judgment dependent on their being similarly enough situated to her to make
> comparison meaningful.

*Id*. at 845-46.

The point of the colloquy above was to show that a plaintiff may not "cherry-pick"

would-be comparators.  *Id*. at 846-47.  Instead, the plaintiff must include "a comparison

group . . . sufficiently comparable to her to suggest that she was singled out for worse

treatment." *Id*. at 846.  Thus, the inquiry remains whether "the members of the comparison group [are] comparable to the plaintiff in all *material* respects."  *Id*. (emphasis in original).  With that in mind, the Seventh Circuit concluded that plaintiff's white male comparators were not similarly-situated to her in all material respects as they had different supervisors and a longer length of service than the plaintiff.  *Id*. at 846-47.

The *Crawford* case did not change the court's inquiry with respect to the fourth prong of Plaintiff's prima facie case.  In a case decided after *Crawford*, the Seventh Circuit cited *Crawford* for the proposition that a plaintiff cannot pick and choose his would-be comparators, and then noted:

> [T]he fundamental issue remains whether such distinctions are so significant that they render the comparison effectively meaningless. In other words, the inquiry simply asks whether there are sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of discrimination or retaliation – recall the plaintiff need not *prove* anything at this stage.

*Humphries v. CBOS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007).

Here, Plaintiff identified several would-be comparators.  The court has found sufficient evidence with respect to only one: Singleton, his supervisor.  Singleton is alleged to have violated Target's employee purchase policy, but, unlike Plaintiff, was not terminated.  The court finds that Singleton is comparable to him in all material respects. He worked at the same Target, T0103, was subject to the same Target policies, including the employee purchase policy, and, like Plaintiff, was a management-level employee under the supervision of Budd and Petross.

24

### 2.      Dr. Harnett's Expert Report

Finally, Plaintiff argues that Dr. Harnett's expert report[2] supports his age

discrimination claim.  As noted above, Dr. Harnett's expert report concludes that Target

employees over the age of 40 who elected to remain in the Traditional Pension Plan were

more likely to be involuntarily terminated than those who selected the Personal Pension

Plan. (Plaintiff's Ex. 5). While statistical evidence is ordinarily used to support a

discriminatory impact claim, it may be used to support a discriminatory treatment claim,

such as Plaintiff's. *Williams v. Giant Food, Inc.*, 370 F.3d 423, 430 n.3 (4th Cir. 2004).

Accordingly, the court will consider it for purposes of this motion.

### 3.      Pretext

Target contends it terminated Plaintiff for a legitimate, non-discriminatory reason

– he violated Target's employee purchase policy.  The court now turns to the issue of

whether Target's asserted reason was a pretext for discrimination.

Pretext "requires more than showing that the decision was 'mistaken, ill

considered or foolish.'"  *Ballance v. City of Springfield*, 424 F.3d 614, 617 (7th Cir.

2005) (quoting *Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000)).  To prevail,

---

[2] Target filed the Expert Report of Michael A. Campion, Ph.D. ("Dr. Campion"), to rebut the opinion of Dr. Harnett. In particular, Dr. Campion purports to correct what Target asserts were coding "errors" within the data it provided to Plaintiff, and on which Dr. Harnett relied in preparing his statistical report.  As Dr. Campion's expert report does not attack the methodology employed by Dr. Harnett, the court finds that Dr. Campion's disagreement with Dr. Harnett's conclusions presents a dispute of fact.  As the motion for summary judgment is brought by Target, the court views the evidence in the light most favorable to Plaintiff, and thus, credits Dr. Harnett's opinion for purposes of this motion.

Plaintiff "must present evidence to suggest not that [Target] was mistaken in [terminating his employment] but that it was lying in order to cover up the true reason, [his] age." *Jordan*, 205 F.3d at 343 (quoting *Vanasco v. National-Louis Univ.*, 137 F.3d 962 (7th Cir. 1998)).

The circumstances of Plaintiff's termination cast Target's asserted reason for terminating him into doubt. On March 24, 2006, Bottom called Plaintiff, as the manager on duty, to the stockroom to inquire about a discontinued TV that was in the stockroom. Bottom then asked Plaintiff if he wanted to purchase it.  Plaintiff initially declined the offer; however, upon further reflection, he decided to buy it for his wife.  With the help of a stockroom employee, Bottom placed the TV in a shopping cart for Plaintiff with the understanding that Plaintiff would purchase it.  Nevertheless, days after Plaintiff purchased the TV – with his wife's credit card and without an employee discount – Singleton asked Bottom to launch an investigation to determine whether Plaintiff purchased the TV in violation of Target's employee purchase policy.  On May 30, 2006, Bottom submitted a report to Singleton, concluding that Plaintiff did in fact fail to offer the TV for sale to the general public prior to purchasing it.  Plaintiff was suspended on April 7, 2006, and ultimately terminated on April 14, 2006.

While Target is correct in asserting that Plaintiff "technically" violated the policy, the circumstances of Plaintiff's termination are suspect.  Bottom, Target's Asset Protection Team Leader, testified that in order for Plaintiff to comply with Target policy, he would have had to either empty a display case or place it on a shelf in violation of

Target's lockdown policy.  In addition, the circumstances under which Plaintiff took the discontinued TV out of the stockroom – in a shopping cart placed there by Bottom – would lead a reasonable person to believe that Plaintiff's purchase was condoned by Target.  Indeed, it was *expected*.  This evidence, coupled with the fact that Singleton had been closely monitoring Plaintiff since at least December 2005 and working on a written warning in conjunction with Budd and Edwards,  (Singleton Dep. at 109-110), could lead a reasonable juror to infer from the circumstances of the TV purchase that Target was lying to cover up the true reason for its decision to terminate Plaintiff, his age.  Accordingly, Target's Motion for Summary Judgment on Plaintiff's age discrimination claim is **DENIED**.

### B.    Disability Discrimination

Plaintiff also alleges he was terminated in violation of the ADA.  A plaintiff may prove employment discrimination with either direct evidence or indirect evidence.  *Leffel v. Valley Financial Serv*., 113 F.3d 787, 792-94 (7th Cir. 1997).  Plaintiff contends he has both direct and indirect evidence of disability discrimination.  The court will begin with Plaintiff's direct case.

### 1.    Direct Evidence

Direct evidence "requires an admission by the decision-maker that his actions were based upon the prohibited animus."  *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003) (quoting *Radue v. Kimberley-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000)).  In other words, the referenced statement/remark must be related to "disability" and made

by a decision-maker or by an individual who provided input into the decision "(1) around the time of, and (2) in reference to, the adverse employment action complained of." *Hunt v. City of Markham, Ill.*, 219 F.3d 649, 652 (7th Cir. 2000).

Plaintiff asserts that during the July 15, 2005, meeting where Edwards and Singleton gave Plaintiff his Final Written Warning, Edwards called Plaintiff "paranoid" and pointed her finger at him. Plaintiff contends that this was a "direct insult to him related to his disability of severe anxiety and depression." (Plaintiff's Response at 23).

The evidence in support of Edwards' alleged use of the term "paranoid" comes from a letter that Plaintiff wrote to Cavasin after he was issued the Final Written Warning. (Plaintiff's Ex. 15). In the letter, he asks Cavasin to reconsider the corrective action and gives his version of the relevant events surrounding the Final Written Warning. Near the conclusion of the document, he notes that he and Singleton had a disagreement as to how certain events transpired, and that he was willing to take a polygraph to prove he was telling the truth. (*Id*. at 4). He writes,

> [Edwards] then laughed and sarcastically said, "Listen to yourself. You are paranoid. You would probably pass because you really do believe what you are saying. The first thing you said when you came in was 'final warning, looks like you're out to get me.'"

(*Id*.).

The court finds Edwards' use of the term "paranoid" is not direct evidence of discrimination, as Edwards' use of the term "paranoid" was not made in reference to his alleged depression and anxiety disorders. Rather, it was used colloquially to show that

she felt his suspicions were unfounded.  Thus, although paranoia may be a symptom of

Plaintiff's disorders, the term was not meant as a personal slight because he suffers from

those disorders.  There being no direct evidence of disability discrimination, the court

turns to Plaintiff's indirect case.

### 2.    Indirect Evidence

Plaintiff's indirect case follows the familiar burden-shifting approach first

articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Leffel*, 113 F.3d

at 792; *Rooney v. Koch Air, LLC*, 410 F.3d 376, 380 (7th Cir. 2005).  In order to establish

a prima facie case of disability discrimination, a plaintiff must show that: (1) he is

disabled within the meaning of the ADA; (2) he was meeting Target's legitimate job

expectations; (3) he suffered an adverse employment action; and (4) Target treated

similarly situated employees outside of his protected class more favorably.  *Kampmier v.*

*Emeritus Corp.*, 472 F.3d 930, 937 (7th Cir. 2007).

Target contends that Plaintiff cannot show that he is disabled within the meaning

of the ADA, that he performed his job adequately, or that Target treated similarly situated

non-disabled employees more favorably than he.  Because one must be "disabled" to fall

within the ADA's protections, the court will begin its discussion with whether Plaintiff is

disabled within the meaning of the statute.

### a.    Whether Plaintiff Meets the Definition of "Disabled" Under the ADA

Title I of the ADA prohibits employers from discriminating "against a qualified

individual with a disability because of the disability of such individual in regard to job

application procedures, the hiring, advancement, or discharge of employees, employee

compensation, job training, and other terms, conditions, and privileges of employment."

42 U.S.C. § 12112(a).  A "qualified individual with a disability" is defined by the ADA to

mean "an individual with a disability who, with or without reasonable accommodation,

can perform the essential functions of the employment position that such individual holds

or desires."  42 U.S.C. § 12111(8).

      The term "disability" is defined under the ADA to mean, with respect to an

individual:

> (A) a physical or mental impairment that substantially limits
> one or more of the major life activities of such individual;
>
> (B) a record of such an impairment;  or
>
> (C) being regarded as having such an impairment.

 42 U.S.C. § 12102(2).  Plaintiff argues that he meets the definition of "disability" under

all three subsections.

      Plaintiff contends that his impairments of severe anxiety and depression

substantially limit his major life activities of working and sleeping, and that his

impairments of the back and spine substantially limit his major life activity of lifting.

### 1.      Major Life Activity of Working

      With respect to the major life activity of "working," an individual must be

"significantly restricted in the ability to perform either a class of jobs or a broad range of

jobs in various classes as compared to the average person having comparable training, skills, and abilities." 29 C.F.R. § 1630.2(j)(3)(i).  This requires Plaintiff to present some evidence of "general employment demographics and/or recognized occupational classifications that indicate the approximate number [and types] of [other] jobs (e.g., 'few,' 'many,' 'most') from which an individual would be excluded because of an impairment."  *Id*.  It is not enough to show that an individual's impairment would exclude him from either a particular job for a particular employer or a narrow range of jobs. *Kupstas v. City of Greenwood*, 398 F.3d 609, 613 (7th Cir. 2005) (citing 29 C.F.R. § 1630.2(j)).

Here, Plaintiff presents a report from Dr. Harrell who opines that Plaintiff suffers from severe depression and anxiety.  She opines that "[w]ithout accommodations and treatment, [Plaintiff] cannot perform management or supervisory jobs, despite the fact that he has been trained to do so and has done so in the past."  (Plaintiff's Ex. 21 at 4). Plaintiff's treating physician's opinion is insufficient to show that Plaintiff is significantly limited in the major life activity of working.  There is no evidence in the record of the demographics of the Southern Indiana job market, nor evidence that Plaintiff's anxiety and depression significantly precluded him from a broad range of jobs.  Accordingly, the court finds that Plaintiff's anxiety and depression do not meet the definition of disability under the ADA.

### 2.    Major Life Activity of Lifting

According to the EEOC regulations, lifting falls within the major life activity of

performing manual tasks.  29 C.F.R. § 1630.2(i).  "When addressing the major life

activity of performing manual tasks, the central inquiry must be whether the claimant is

unable to perform the variety of tasks central to most people's daily lives, not whether the

claimant is unable to perform the tasks associated with her specific job." *See Mack v.*

*Great Dane Trailers*, 308 F.3d 776, 781 (2002).  Plaintiff presents no evidence that his

20-pound lifting restriction prevents him from performing a variety of tasks central to

most people's lives.  Indeed, there is no evidence that his lifting restriction significantly

impacted his ability to perform his job.  Plaintiff's lifting restriction therefore fails to

meet the definition of disability under the ADA.

### 3.        Major Life Activity of Sleeping

Sleeping is a major life activity under the ADA.  *Scheerer v. Potter*, 443 F.3d 916,

920-21 (7th Cir. 2006).  With respect to the major life activity of sleeping, a plaintiff must

show that he is significantly restricted in sleeping, as compared to the condition, manner,

or duration under which the average person in the general population can sleep.  29

C.F.R. § 1630.2(j).  A showing of disrupted, intermittent sleep difficulties is insufficient

to show a substantial limitation; rather, a plaintiff must show that his sleep difficulties are

"prolonged, severe and long-term."  *Scheerer*, 443 F.3d at 920-21.

Here, Plaintiff contends that his medications for anxiety and depression restrict his

sleep to only four hours per night, and that he feels fatigued and tired during the day.

(Plaintiff Dep. at 297).  Beyond that, Plaintiff testified that Dr. Harrell prescribed sleeping

pills that he may take on an as-needed basis.  (*Id*. at 296).  Whether Plaintiff in fact takes

the sleeping pills as a sleep aid is not in the record.

Plaintiff's evidence with respect to his sleep deprivation is insufficient.  At most, it shows that Plaintiff has difficulty sleeping throughout the night.  Such evidence cannot establish the type of "prolonged, severe and long-term sleep difficulties that can amount to a substantial limitation in the major life activity of sleeping." *Scheerer*, 443 F.3d at 920 (citing *Pack v. Kmart Corp.*, 166 F.3d 1300, 1306 (10th Cir. 1999) (finding that intermittent or treatable sleep difficulties that resulted from major depression did not substantially limit the major life activity of sleep)).  The court therefore finds Plaintiff's sleeping difficulties insufficient to fall within the definition of disability under the ADA.

### b.      Record of Impairment

Plaintiff next contends that he had a record of impairment with Target.  In order to show a "record of impairment," Plaintiff must show that his impairments substantially limit one or more major life activities.  29 C.F.R. § 1630.2(k); *Kampmier v. Ereritus Corp.*, 472 F.3d 930, 938 (7th Cir. 2007) (citing *Rooney*, 410 F.3d at 381).  As demonstrated above, Plaintiff did not submit evidence to that effect.

### c.      Regarded As Disabled

Finally, Plaintiff contends that Target regarded Plaintiff as disabled.  To fall within the statutory definition, a plaintiff must show that "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." *Sutton v. United*

*Airlines, Inc.*, 119 S.Ct. 2139, 2149-50 (1999).

In support of Plaintiff's claim, Plaintiff notes that Target was aware of his impairments as documents in his personnel file confirm medical leaves for anxiety and depression in 2001 and 2005.  He also points to the fact that just 17 days before his termination, Plaintiff informed Singleton that he would need to take a medical leave of absence for additional back surgery.  This, coupled with Singleton's testimony that Plaintiff was "unstable," Edward's statement that he was "paranoid," and "evidence that other employees were tired of hearing about [Plaintiff's] back problems and mental impairments further indicate" that Target perceived Plaintiff's impairments as "preclud[ing] him from performing his job satisfactorily."  (Plaintiff's Response at 26-27).

This evidence is insufficient to show that Target regarded Plaintiff as disabled.  First, Plaintiff himself argues that Target's perception of his impairments only affected his particular job.[3]  He does not argue, as he must, that Target viewed Plaintiff as substantially limited with respect to a particular class or a broad range of jobs.  *Nese v. Julian Nordic Const. Co.*, 405 F.3d 638, 643 (7th Cir. 2005).  Second, just because Target had knowledge of his previous leaves of absence and that he was scheduled for an upcoming surgery does not, in and of itself, establish a "regarded as" claim.  *Id.* (knowledge of plaintiff's impairment does not establish a "regarded as" claim).  Third,

---

[3] The court presumes, based upon this argument, that Plaintiff argues that Target believed he was substantially limited in the major life activity of working.

the fact that Edwards called him "paranoid" has no connection to his disability, as earlier discussed.  Fourth, Plaintiff's claim that Singleton called him "unstable" is nowhere in the record, nor is Plaintiff's claim that Singleton heard comments from other Target employees that they were tired of hearing about Plaintiff's back problems and impairments.  The court therefore finds that Plaintiff has not shown that Target "regarded" him as disabled.

For all of the reasons stated above, the court finds that Plaintiff is not disabled within the meaning of the ADA, and is therefore not entitled to its protections.  As this determination is a threshold finding, the court need not discuss the additional elements necessary to bring an indirect claim for disability discrimination.  The court therefore **GRANTS** Target's Motion for Summary Judgment on Plaintiff's disability discrimination claim.

### C.    Retaliation

Plaintiff also alleges that Target retaliated against him for his complaints of age and disability discrimination.  Plaintiff proceeds under the direct method.  Thus, Plaintiff must establish that: (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) there is a causal link between the protected expression and the adverse action.  *Humphries*, 474 F.3d at 404; *Treadwell v. Office of Ill. Secretary of State*, 455 F.3d 778, 781 (7th Cir. 2006).

### 1.    Adverse Employment Action

Plaintiff cites to the same adverse employment actions in support of his retaliation

claim as he did in support of his age discrimination claim.

In order to establish an adverse employment action in a Title VII retaliation case, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington Northern & Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2415 (2006).  This standard differs from that utilized in discrimination cases.  For example, the Seventh Circuit recently held that a plaintiff's performance warnings issued prior to his termination did not constitute adverse employment actions for purposes of his race and national origin discrimination claims because they did not "affect[] his 'compensation, terms, conditions or privileges of employment.'" *Pantoja v. Am. NTN Bearing Mfg. Corp.*, – F.3d –, 2007 WL 2230095, at *6 (7th Cir. Aug. 6, 2007).  The court further held, however, that those same performance warnings were sufficient to raise a jury question as to whether they constituted adverse employment actions for purposes of his retaliation claim.  *Id*. at *7 (Whether an employment action is adverse "is a context-driven inquiry, and we have declined to rule categorically that warnings cannot be adverse actions.") (internal citation omitted).  Given the holding in *Pantoja*, the court finds, in an abundance of caution, that whether the Mid-Year Review and Work Performance Plan are adverse employment actions is best left for a jury to decide.

That leaves Plaintiff's request to transfer to another Target store to avoid Singleton's continued supervision, his being placed in the "Bottom 10%" of Target's

Performance Grid, and his Final Written Warning.  Plaintiff does not argue whether there

is a causal link between these alleged adverse actions and any protected activity.  Thus,

even if the court were to find that the actions stated above were materially adverse under

the teaching of *Burlington Northern*, those actions would not support his claim for

retaliation.

   **2. Causal Link**

     **a. Mid-Year Performance Review and Work Performance
       Plan**

  Plaintiff filed his EEOC charge on November 16, 2005, and Plaintiff received his

Mid-Year Performance Review and Work Performance Plan on November 23, 2005.

Those documents were signed by Singleton, Budd, and Plaintiff.  (*See* Defendant's Exs.

36, 37).  Target contends that there is no causal connection between the two events

because it did not receive a copy of the EEOC charge until November 25, 2006.  Target

admits, however, that Plaintiff informed Budd that he filed the EEOC charge on

November 16, 2005.  The fact that he did not inform Budd of the contents of the charge is

immaterial for purposes of this motion.

  Target next contends that there is no causal connection because it completed

Plaintiff's Mid-Year Performance Review prior to November 16, 2005.  The evidence it

cites in support of that proposition does necessarily support that claim.  (*See* Defendant's

Exs. 36, 37, 103, 104).  Exhibits 36 and 37 are copies of the Mid-Year Performance

Review and Work Performance Plan.  Exhibit 103 is an email between Singleton, Budd

and Edwards discussing Plaintiff's performance review dated November 18, 2005, and

Exhibit 104 is a copy of Singleton's notes memorializing the meeting between Singleton,

Budd, and Plaintiff dated November 23, 2005, in which Plaintiff received the above

negative performance evaluation and performance plan.  None of the exhibits show that

those documents were completed prior to November 16, 2005.

### b.    Plaintiff's Suspension and Termination

Plaintiff filed his second charge of discrimination on March 5, 2006, alleging that

Target was discriminating against him on the basis of his age and disabilities, and

retaliating against him for filing his previous charge of discrimination.  On March 24,

2006, Bottom called Plaintiff to the stockroom, informed him of the TV she found in the

stockroom that did not come up on the UPC scanner, and asked him to buy the TV.  The

circumstances of the purchase have already been discussed.  *See* Section III.A.3.  Those

circumstances, coupled with Singleton's close monitoring of Plaintiff (in conjunction

with Budd and Edwards) and Plaintiff's poor work evaluations (prior to March 2005, he

had received satisfactory reviews), a reasonable juror could conclude that Target

terminated Plaintiff in retaliation for his previous complaints of discrimination, including

his March 5, 2006, charge.  Accordingly, the court **DENIES** Target's Motion for

Summary Judgment on Plaintiff's retaliation claims.

### D.    ERISA Interference Claim

It is unlawful to interfere with an employee's benefits that are protected under

ERISA.  Specifically, ERISA Section 510 states, in pertinent part:

It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan.

29 U.S.C. § 1140.  To prevail, a plaintiff "must demonstrate that [his] employer[] terminated [him] with the specific intent of preventing or retaliating for the use of benefits." *Lindemann v. Mobil Oil Corp.*, 141 F.3d 290, 295 (7th Cir. 1998).

Plaintiff's only evidence to support his ERISA claim is the expert report of Dr. Harnett.  As noted previously, his report contains a statistical analysis concluding that "discrimination" occurred against "employees over 40 who selected the Prior Plan [i.e. the Termination Plan]."  (Plaintiff's Ex. 5 at 8).  Plaintiff's statistical evidence, however, does not relieve him of his burden of showing Target's specific intent to discriminate on the basis of age.  In other words, Plaintiff must come forward with some evidence that the decision-makers in his case – Singleton, Petross, and Budd – had knowledge that he elected to remain in the Traditional Pension Plan.  *See Lindemann v. Mobil Oil Corp.*, 141 F.3d 290, 296-97 (7th Cir. 1998).  There is no evidence in the summary judgment record that these individuals had any such knowledge.  (Singleton Dep. at 139 (testifying that he did not know that Plaintiff was a participant in the Traditional Pension Plan); Budd Dep. at 129 (same); Petross Aff. ¶ 28).  Indeed, Budd, Singleton, Cavasin and Edwards testified that they did not even know what Pension Plan they were vested in.  (Budd Dep. at 129; Singleton Dep. at 139; Cavasin Dep. at 10-11; Edwards Dep. at 114-16).

**IV.     Conclusion**

For the reasons explained above, the court **GRANTS** in part, and **DENIES** in part,

Defendant's Motion for Summary Judgment (Docket # 58).  Specifically, the court

**GRANTS** Defendant's motion with respect to Plaintiff's ADA and ERISA claims, but

**DENIES** Defendant's motion with respect to Plaintiff's ADEA and retaliation claims.

**SO ORDERED** this <u>11th</u> day of October 2007.

 

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Electronic Copies to:

Edward O'Donnell DeLaney
DELANEY & DELANEY LLC
ed@delaneylaw.net

Kathleen Ann DeLaney
DELANEY & DELANEY LLC
kathleen@delaneylaw.net

Tami A. Earnhart
ICE MILLER LLP
earnhart@icemiller.com

Paul C. Sweeney
ICE MILLER LLP
paul.sweeney@icemiller.com